## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL G. SULLIVAN, in his official capacity as Chief, United States Capitol Police, <br><br> Defendant. | Civil Action No. 25-1026 (BAH) <br><br> Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiff Jason Leopold, an investigative journalist, seeks disclosure of certain United States Capitol Police ("USCP") policy directives in effect on January 6, 2021, when a "mob attacked and breached the United States Capitol."  Compl. for Declaratory & Injunctive Relief ("Compl.") ¶¶ 8, 13, 15, ECF No. 1.  USCP is located within the Legislative Branch and not subject to the Freedom of Information Act ("FOIA"), *see* 5 U.S.C. § 552, so plaintiff seeks a writ of mandamus ordering Michael G. Sullivan, the Chief of USCP, to disclose the directives pursuant to the common law right to access public records, Compl. ¶ 1.

The federal record access claim at issue here falls outside the statutory guideposts of the FOIA, relying instead on a common law "general right to inspect and copy public records and documents, including judicial records and documents."  *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted).  In this Circuit, this right of access "'extends . . . to the "public records" of all three branches of government,' . . . including the Legislative Branch."  *Schilling v. United States House of Representatives*, 102 F.4th 503, 507 (D.C. Cir. 2024) (first omission in original) (quoting *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 936 (D.C. Cir. 2003) (quoting *Wash. Legal Found. v. U.S. Sent'g Comm'n* ("*WLF II*"), 89 F.3d 897, 903 (D.C. Cir.

1996))); *see also Musgrave v. Warner*, 104 F.4th 355, 360 (D.C. Cir. 2024). Although the Supreme Court has made clear that "there is no constitutional right to obtain all the information provided by FOIA laws," *McBurney v. Young*, 569 U.S. 221, 232 (2013), the common law right of access is described by the D.C. Circuit as "a precious common law right . . . that predates the Constitution itself," *United States v. Mitchell*, 551 F.2d 1252, 1260 (D.C. Cir. 1976), *rev'd on other grounds sub nom. Nixon*, 435 U.S. 589. Courts have rightly waxed eloquent as to the policy underpinnings of the common law right of access as "fundamental to a democratic state," *Judicial Watch, Inc. v. Schiff*, 998 F.3d 989, 993 (D.C. Cir. 2021) (Henderson, J., concurring) (quoting *Mitchell*, 551 F.2d at 1258), by "ensuring that the people remain in control of their government," *id*. (*quoting In re Sealed Case*, 121 F.3d 729, 749 (D.C. Cir. 1997)); *see also Nixon*, 435 U.S. at 597-98 ("The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, and in a newspaper publisher's intention to publish information concerning the operation of government." (citations omitted)).

Despite its potential scope, this common law right of access is "almost always invoked in cases involving access to court documents," and, thus, "the nature and scope of the common law right of access to documents in the Legislative Branch is relatively undeveloped," *Musgrave*, 104 F.4th at 360 (cleaned up), leaving open "novel mandamus issue[s]" dispositive of plaintiff's claims in this case, *Leopold v. Manger*, 102 F.4th 491, 497 (D.C. Cir. 2024); *see also Nixon*, 435 U.S. at 597, 598-99 (observing that "[i]t is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate," and, further, that this right's "contours have not been delineated with any precision").

2

With these novel issues as to the contours of the federal common law right of access to non-judicial records front and center, pending before the Court is defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6). Def.'s Mot. to Dismiss & Mem. in Supp. ("Def.'s MTD"), ECF No. 10. This lawsuit is the sequel to plaintiff's first effort to obtain access to the requested USCP records. In 2022, plaintiff's nearly identical lawsuit was dismissed for lack of subject matter jurisdiction, on the parties' cross-motions for summary judgment, *Leopold v. Manger*, 630 F. Supp. 3d 71, 87 (D.D.C. 2022), and, in 2024, this decision was affirmed by the D.C. Circuit, *Leopold v. Manger*, 102 F.4th 291 (D.C. Cir. 2024). On appellate review, the D.C. Circuit concluded that plaintiff had failed to address an essential element for mandamus relief, namely, that the USCP Chief owed him a clear and indisputable ministerial duty to release the requested records, *id.* at 497-98, but expressly noted that plaintiff was free to refile his suit to address that deficiency, *id.* at 503. With that guidance and prompting, plaintiff in this new action again seeks the same USCP policy directives. Compl. ¶ 4.

Now, in the motion to dismiss posture and with the D.C. Circuit's opinion from the previous action binding this Court but presenting more "novel" questions than answers, *see Leopold*, 102 F.4th at 498, overlapping jurisdiction and merits issues are presented on a record less fulsome than that available when plaintiff's previous action was resolved on cross-motions for summary judgment. After review of the questions left open by the D.C. Circuit, the Court concludes that plaintiff has stated a claim for relief and established jurisdiction, at least in the current procedural posture, for 100 of the 101 directives sought. Defendant's motion to dismiss is thus granted in part and denied in part.

I.    **BACKGROUND**

Summarized below are the facts, as described in the Complaint, and procedural history of plaintiff's prior action and the instant case.

On January 6, 2021, "a mob attacked and breached the United States Capitol, disrupting a joint session of the United States Congress that was in the process of certifying the results of the 2020 presidential election."  Compl. ¶ 13.  USCP, "a law enforcement agency" established by Congress to "police the United States Capitol Buildings and Grounds" and overseen by the Capitol Police Board, *id.* ¶ 12, "faced intense public scrutiny following the January 6 insurrection," *id.* ¶ 14.

Three weeks after the attack, plaintiff submitted several requests to USCP's Public Information Office and Office of the Inspector General, requesting access to a wide spate of records, including "USCP written directives in effect on January 6, 2021." *Id.* ¶ 15.  USCP initially declined to produce the directives, *id.* ¶ 16, after which plaintiff filed a petition for a writ of mandamus in this Court against the Chief of Capitol Police and USCP's Inspector General, seeking to compel production of the directives and other documents pursuant to the common law right of access to public records, *id.* ¶ 17; *see Leopold*, 630 F. Supp. 3d at 74.[1]

A.    **2022 District Court Decision**

During the pendency of the first iteration of this case, USCP disclosed many of the requested documents, including "semiannual reports of USCP disbursements from 2015" onward, "demonstration permits, denials, or other written materials of final decisions relating to permits for public gatherings on the Capitol grounds on January 6, 2021," and "two USCP written

---

[1]    In the first action, Buzzfeed News was also a plaintiff, and USCP's Inspector General, in his official capacity, was named as a defendant, *Leopold*, 630 F. Supp. 3d at 74, but neither is a party to the instant action, *see* Compl.

directives in effect on January 6, 2021." *Leopold*, 620 F. Supp. 3d at 74 n.4 (quoting defendants'

statement of material fact). Additionally, plaintiff "narrowed [his] request" by "no longer asserting

a right to access the requested USCP financial statements" and seeking only "101 directives" in

effect on January 6, 2021. *Id.* (citing both parties' summary judgment briefing). The only

remaining contested documents were the same 101 USCP policy directives at issue here, *see*

Compl., Ex. A, Index of Directives, ECF No. 1-2 (listing these 101 directives), and reports by

USCP's Office of the Inspector General ("OIG") from 2008 through the present, *Leopold*, 620 F.

Supp. 3d at 76.

Upon the parties' cross-motions for summary judgment, this Court "construed [defendants'

motion for summary judgment] to be a motion for dismissal for lack of subject matter jurisdiction,"

because "[d]efendants contend[ed] that sovereign immunity bar[red] the exercise of jurisdiction."

*Leopold*, 630 F. Supp. 3d at 74. Defendants' argument that "[p]laintiffs must identify a waiver of

sovereign immunity that is unequivocally expressed in statutory text," was rejected in reliance on

the *Larson-Dugan* exception to sovereign immunity. *Id*. at 79-80 (discussing *Larson v. Domestic

& Foreign Com. Corp*., 337 U.S. 682 (1949), and *Dugan v. Rank*, 372 U.S. 609 (1963)). This

Court held that this exception allowed the exercise of jurisdiction to order specific mandamus relief

against an officer acting in violation of statutory, constitutional, or common law command, and

that "applicability of the exception turns first on the existence of the duty" to disclose the

documents sought, meaning that "the question of jurisdiction merges with the merits." *Id.* at 80

(internal quotation marks omitted) (quoting *WLF*, 89 F.3d at 901-02).

Proceeding to the merits, this Court first determined that the common law right of access

did not apply to 65 of the 101 directives, because they "constitute security information under 2

U.S.C. § 1979(a)," which statute "'preempts the common law right' of public access." *Leopold*,

630 F. Supp. 3d at 81 (quoting *Ctr. for Nat'l Sec. Studs. v. DOJ*, 331 F.3d 918, 937 D.C. Cir. 2003)). Specifically, under 2 U.S.C. § 1979, "security information"—defined as information held by USCP that "is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds"—"may be released . . . only if the Capitol Police Board determines . . . that the release of security information will not compromise the security and safety of the Capitol buildings and grounds or any individual whose protection and safety is under the jurisdiction of the Capitol Police." 2 U.S.C. § 1979(a)-(b).

Sworn declarations submitted by USCP's Inspector General and Senior Counsel explained that these 65 directives "contain operational information that would reveal confidential sources and methods, investigative activities and techniques" of USCP and "reflect the USCP's internal policies, rules, protocols, and guidance for USCP personnel on a variety of subjects." *Leopold*, 630 F. Supp. 3d at 82. After considering the content of these directives based on the aforementioned declarations and the directives' titles, such as "Use of Force," "Vehicular Pursuits," and "Responding to a Suicide Bomber," this Court concluded that "designation [of these 65 directives] as 'security information' and the resultant limitations on access contemplated by 2 U.S.C. § 1979(b) is . . . proper." *Id.* at 83 (internal quotation marks omitted). Similarly, based on the Inspector General's declaration explaining that the OIG reports "could include, for example, . . . sensitive posting locations for USCP officers and personnel in the Capitol building" or "sensitive details regarding particular internal USCP programs in their recommendations for comprehensive compliance," this Court also found that the "OIG reports' designation as security information . . . [is] proper." *Id.* (internal quotation marks omitted). Accordingly, as to the OIG

reports and 65 directives designated as containing security information, "the common-law right of public access [was] not in play," because the specific statutory scheme created by Congress for disclosure of these records displaced the common law right of access.  *Id.*

Turning to the remaining 36 USCP policy directives that did not contain security information statutorily protected under 2 U.S.C. § 1979(b), this Court conducted the "two-step process outlined by the D.C. Circuit for determining whether the common-law right of access applies."  *Id.* (citing *Wash. Legal Found. v. U.S. Sentencing Comm'n* ("*WLF I*"), 17 F.3d 1446, 1451-52 (D.C. Cir. 1994)).  "First a court must decide whether the document sought is a public record, and, if it is, then, second, the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure."  *Id.* (internal quotation marks and citations omitted).  The Court first concluded that these 36 directives, which were all designated "Law Enforcement Sensitive" and not publicly disseminated, "may be consulted to guide the action of USCP personnel but, as such, amount to preliminary material and advisory guidance that may only eventually lead to an official action," and therefore "do not constitute 'public records' as the term has been construed by the D.C. Circuit."  *Id.* at 84-85.

This Court nonetheless proceeded to apply the full *WLF I* test, assuming that the "36 USCP written directives qualified as public records," and concluded their requested disclosure would fail the second part of the test for public access, which requires "balanc[ing] the government's interest in keeping the document[s] secret against the public's interest in disclosure."  *Leopold*, 630 F. Supp. 3d at 85 (alterations in original) (quoting *WLF II*, 89 F.3d at 903).  "All the written directives at issue—including the 36 not considered security information under 2 U.S.C. § 1979(a)—are designated 'Law Enforcement Sensitive,'" meaning that they are "accessible on a need-to-know basis only."  *Id.*  Quoting from a declaration by a USCP Senior Counsel, this Court noted that

disclosure of these documents "could unduly reveal the methods, techniques, and responses that the USCP employs for Capitol Grounds security and could also increase the potential for individuals and groups that wish to disrupt, attack, or harm the Capitol or the Congress to do so." *Id.* (internal quotation marks omitted).  On the other side of the scales, the remaining 36 directives were "administrative and personnel-related in nature" and did not "focus on . . . the manner in which USCP substantively enforces the law."  *Id.*  Thus, any "minimal public interest would . . . be outweighed by the government's interest in restricting access to Law Enforcement Sensitive Information."  *Id.*

Finally, this Court concluded that the "organic statute creating the USCP [Inspector General], 2 U.S.C. § 1909" did not "provid[e] a statutory right of access to the OIG semiannual reports," which were among the documents sought from the OIG.  *Id.* at 86.

### B.    2024 D.C. Circuit Decision

On appeal, the D.C. Circuit affirmed the grant of summary judgment to defendants, agreeing (1) that the *Larson-Dugan* exception to sovereign immunity applied to a petition for mandamus seeking to remedy a breach of the common law right of access to public records, and not just to breaches of statutory duties, *Leopold*, 102 F.4th at 495, (2) that assessing the applicability of the exception would require merging jurisdiction with the merits assessment, *id.* at 498; (3) that the D.C. Circuit has interpreted *Nixon* as "clear[ly]" extending the common law right of access to Legislative Branch records, *id.* at 493, 497 (citing *Nixon*, 435 U.S. at 597, at both pin-cites), and (4) that 2 U.S.C. § 1909 did not require the disclosure of the OIG's semiannual reports and, in fact, the Inspector General Act, 5 U.S.C. § 404(e)(2) "forbade the Inspector General from publishing the audits and reports that Mr. Leopold seeks," *id.* at 502-03.

As to the applicability of the common law right of access to the 65 USCP policy directives and OIG reports identified by USCP as containing "security information," the D.C. Circuit left undisturbed, without comment, this Court's finding that these 65 directives were properly designated as containing "security information." *Id.* at 501-02. Moreover, the D.C. Circuit agreed, upon concession by plaintiff, that "the Capitol Police need not—indeed, may not—release information that is properly designated as 'security information' under 2 U.S.C. § 1979." *Id.* Further, the D.C. Circuit "reject[ed] Mr. Leopold's request for a remand to the District Court where the government would be ordered to segregate and disclose those portions of the withheld documents that do not contain security information." *Id.* at 502. In the Circuit's view, even if "Section 1979 applies to only 'security information,'" and "the Capitol Police and Inspector General are withholding entire documents," "Mr. Leopold would still need to show that the Capitol Police have a clear, indisputable, and ministerial duty to segregate the portions of the documents that are not security information." *Id.* at 501. The question whether a common law duty of segregation and redaction—*i.e.*, requiring access to releasable portions of a document that contains non-releasable information—could be imposed on USCP was another issue for which "[t]he pathway to the necessary conclusions is not intuitive . . . [and] also unbriefed even though necessary to invoke mandamus jurisdiction." *Id*. at 502. As the Circuit explained, "[e]ven though Mr. Leopold asks for mandamus based on various alleged breaches of duties, he has not pled nor briefed how or why each form of relief he seeks is ministerial," and "[m]andamus jurisdiction lies only to compel ministerial, as opposed to discretionary, duties." *Id.* at 497 (citing *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 610 (1838)). Thus, the Circuit affirmed dismissal of plaintiff's claimed entitlement, under the common law right of access, to release of the OIG reports and the 65 directives containing security information.

The Circuit disagreed with this Court's finding, at the first step of the *WLF I* test, that the other 36 USCP policy directives, which were marked as "Law Enforcement Sensitive" but not designated as "security information," were not "public records." *Leopold*, 102 F.4th at 500. In the D.C. Circuit's now binding view, these documents "memorialize an official action (the creation and adoption of a policy) and are public documents under *Washington Legal Foundation II*." *Id.* As to the second step of the common law right of access test, the Circuit noted that precedent "empower[s] district courts to order a *Vaughn* index when there is ambiguity as to whether the common law right should extend to the records sought," and that the 36 non-security-information directives "cover[ed] a wide range of topics, including substantive law enforcement policies." *Id.*[2] Thus, the Circuit "t[ook] Mr. Leopold's point that a *Vaughn* index likely would have aided the District Court's analysis," *id.*, notwithstanding that this Court had the benefit of detailed declarations by the USCP Inspector General and Senior Counsel and that the precedent of this Circuit and the Supreme Court is clear that, even in applying FOIA, "the government does not necessarily have to produce a *Vaughn* index to justify denying a . . . request . . . . Specific holdings of this court and the Supreme Court permit the satisfaction of the government's burden of proof . . . through generic, categorical showings" that describe the type of document and the reason for withholding, *Maydak v. DOJ*, 218 F.3d 760, 766 (D.C. Cir. 2000); *see also Larson v. Dep't of State*, 565 F.3d 857, 870 (D.C. Cir. 2009) ("[T]he agencies' affidavits standing alone were sufficiently specific to place the challenged documents within the [FOIA] exemption categories," so document-by-document review by court was not necessary.). Without addressing this Court's

---

[2]     A *Vaughn* index is a document that correlates a federal agency's withholdings in response to a FOIA request, with the agency's identification of the FOIA exemption(s) relied upon and justification for the withholding. This tool "is a now standard tool conceived by the District of Columbia circuit to facilitate resolution of FOIA disputes, derived from the D.C. Circuit's decision in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)." *Union Leader Corp. v. United States Dep't of Homeland Sec.*, 749 F.3d 45, 49 n.3 (1st Cir. 2014).

finding that these 36 documents were designated "Law Enforcement Sensitive," as supported by review of USCP's declarations describing the safety risks associated with their public disclosure, *Leopold*, 630 F. Supp. 3d at 85, the Circuit concluded that "the District Court failed to analyze 'each category of document requested,' and rejected Mr. Leopold's request 'without knowing precisely what records were at issue.'" *Leopold*, 102 F.4th at 500 (quoting *WLF I*, 17 F.4th at 1452). In so doing, the D.C. Circuit indicated strong support, if just short of an express imposition of a requirement, for a *Vaughn* index obligation on Legislative Branch entities subject to a common law public right of access to those entities' public records.

With these critiques of this Court's methodology, the Circuit affirmed dismissal of plaintiff's petition for mandamus as to these 36 directives because, once again, plaintiff "failed to brief a necessary element to receive mandamus relief: that the Capitol Police abridged a clear and indisputable duty to provide access to these records." *Id.* (internal quotation marks omitted). What plaintiff had to do to plead—and what a court was supposed to look for—"to determine whether the duty to provide access to records is ministerial or discretionary," was left unanswered. *Id*. at 501. The D.C. Circuit simply stated, "we have yet to decide this question." *Id.*

The Circuit encouraged plaintiff that he was "free to refile his complaint with the requisite allegations to satisfy the mandamus standard if he so desires and if he plausibly believes that he can prove those allegations." *Id.* at 503. At the same time, the Circuit highlighted that the question whether production of the 36 non-security-information directives and redaction of the 65 security-information directives was a discretionary or ministerial duty presented a "novel mandamus issue." *Id.* at 498.

### C.    Instant Action

Less than a year after the D.C. Circuit's affirmance of dismissal of the first action, plaintiff filed the instant mandamus action seeking access to the 101 USCP directives, in whole or part, in effect on January 6, 2021, under a single claim that defendant breached his "nondiscretionary duty under the common law to release those records" or, where "a portion of a record is exempt from the common law right of access," to "make public appropriately redacted documents." *See* Compl. ¶¶ 53, 54 (alterations accepted and internal quotation marks omitted). Specifically, plaintiff "now limits the scope of his request to the 36 directives not containing 'security information' and the reasonably segregable portions of the 65 directives containing 'security information' maintained by [USCP]." *Id.* ¶ 37. As in the prior action, the Complaint alleges that plaintiff will prevail under both steps of the *WLF* test to obtain disclosure of the documents sought, *see* Amended Compl., *Leopold v. Manger*, No. 21-cv-465 (D.D.C. filed May 10, 2021), ECF No. 12, and adds to those allegations that, upon this Court making the judgment that the common law right of access applies to the requested policy directives, pursuant to the *WLF I* test, Compl. ¶ 39 (citing *WLF I*, 17 F.3d at 1451), defendant will have "no discretion in deciding whether or not to comply with this Court's ultimate order," *id.*, rendering compliance and release of requested records "nondiscretionary," *id.* ¶ 49; *see also id.* ¶ 53 ("Defendant has a nondiscretionary duty under the common law to release those records absent a determination by this Court that the 'specific interests favoring secrecy outweigh the general and specific interests favoring disclosure.'" (quoting *WLF I*, 17 F.3d at 1451)).

Defendant moves to dismiss, citing both Federal Rules of Civil Procedure 12(b)(1) and (b)(6), Def.'s MTD at 7, arguing that plaintiff is trying "to circumvent FOIA's explicit restriction exempting the Capitol Police," *id.* at 5, "without identifying an unequivocal congressional waiver

of sovereign immunity . . . in a statute," *id.* at 9, and, consequently, the exercise of jurisdiction is barred by sovereign immunity and the claim fails to support the issuance of a writ of mandamus, *id.* at 10.  This motion is now ripe.  *See* Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 12; Def.'s Reply in Support of MTD ("Def.'s Reply"), ECF No. 13.  In contrast to the prior action, neither party has submitted any supplemental factual support for their arguments in the form of declarations, affidavits, or a *Vaughn* index.

## II.    LEGAL STANDARD

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'"  *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton,* 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))).  Federal courts therefore have a corresponding "independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).  Absent subject-matter jurisdiction over a case, the court must dismiss it.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); FED. R. CIV. P. 12(h)(3).

To survive a motion to dismiss for lack of subject matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue.  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). When considering a motion to dismiss under Rule 12(b)(1), the court must determine jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the

complaint and "constru[ing] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). Inferences drawn by the plaintiff need not be accepted, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *Id.* at 288 (noting that liberally construing complaint in plaintiff's favor "does not entail accepting inferences unsupported by facts or legal conclusions cast in the form of factual allegations" (alterations accepted and internal quotation marks omitted)); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The court "may consider materials outside the pleadings" in assessing whether subject matter jurisdiction may be exercised. *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," although the allegations need not be "detailed." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1104 (D.C. Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The alleged facts must not be "'merely consistent with' a defendant's liability" but rather must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007)). All factual allegations in the complaint must be accepted as true, "even if doubtful in fact," *Twombly*, 550 U.S. at 555, though the court does "not assume the truth of legal conclusions, nor . . . 'accept inferences that are unsupported by the facts set out in the complaint,'" *Arpaio*, 797 F.3d at 19 (citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

In assessing the sufficiency of a complaint under Rule 12(b)(6), a court's consideration is limited "to materials properly before it," including, in this Circuit, "'the facts alleged in the complaint, [and] documents attached thereto or incorporated therein.'" *Page v. Comey*, 137 F.4th 806, 813 (D.C. Cir. 2025) (alteration in original) (quoting *Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (noting that, in deciding motion to dismiss, consideration may be given to "documents incorporated into the complaint by reference, and matters of which the court may take judicial notice").

## III.    DISCUSSION

As the D.C. Circuit observed, this case presents "novel" issues, *Leopold*, 102 F.4th at 498, and examining the appellate jurisprudence undergirding the common law right of access is helpful in illuminating how we got here.  Following this review, the questions left open by the D.C. Circuit in *Leopold* are addressed and then applied to resolve the pending motion to dismiss the Complaint seeking access, in whole or in part, to the 101 USCP policy directives at issue.

### A.    The Common Law Right of Access in the D.C. Circuit

*Nixon,* the first of only two Supreme Court cases expressly addressing the common law right of access to public records, rejected the decisions of both the district court and the D.C. Circuit regarding access to the judicial records at issue.  To start from the beginning: In October 1974, six defendants were on trial for the break-in at the 1972 Democratic National Convention, and "some 22 hours of taped conversations" recorded at the White House "were played for the jury and the public in the courtroom."  *Nixon*, 435 U.S. at 594.  Although the public and media could listen to the court proceedings and were provided with paper transcripts of the portions of the tapes admitted into evidence, reporters sought "permission to copy, broadcast, and sell to the public the

portions of the tapes played at trial." *Id.* The trial judge denied this motion, finding that the public's right to hear the recordings was diminished by the public's preexisting access to the transcripts and to the live playing of the tapes in court, and that defendants had an interest in preventing the tapes from being used to "generate excitement in an air of ridicule" prior to their appeal. *Id.* at 595 (internal quotation marks omitted). The D.C. Circuit reversed to allow access to the tapes, "stress[ing] the importance of the common-law privilege to inspect and copy judicial records" and holding that the individual seeking to prevent access, here President Nixon, shouldered the burden of showing his interests outweighed the public's interest in disclosure. *Id.* at 596. The Supreme Court "granted certiorari to review this holding that the common-law right of access to judicial records requires the District Court to release the tapes in its custody." *Id.*

At the Supreme Court, both parties "acknowledge[d] the existence of a common-law right of access to judicial records," though they contested whether this right applied to the tapes at issue. *Id.* at 597. Working from the parties' concession that such a common law right to access judicial records existed, the Court observed, "It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Id.* (footnotes omitted). Since *Nixon*, however, involved only judicial records—*i.e.*, records that had been admitted as evidence in a case before a court—the Court focused on that application and "assume[d], *arguendo*, that [the right] applies to the tapes at issue here," *id*. at 599, noting that any "right to inspect and copy judicial records is not absolute," *id.* at 598. Without expressly holding (but merely assuming) that the tapes at issue were "judicial records," the Court then side-stepped entirely the question, on which the district court and D.C. Circuit had disagreed, of whether a common law right of access applied to require disclosure of the tapes, and decided the case on an "additional, unique element that was neither advanced by the parties nor given appropriate

consideration by the courts below," namely, the new law called the Presidential Recordings Act, which set up an administrative procedure for releasing the President's tapes to the public. *Id.* at 603. Since the "Executive and Legislative Branches . . . possess superior resources for assessing the proper implementation of public access and the competing rights, if any, of the persons whose voices are recorded on the tapes," and those "resources [we]re . . . brought to bear under the Act," the Court held "that the common-law right of access to judicial records does not authorize release of the tapes in question from the custody of the District Court." *Id.* at 607-08.

As is apparent from this review, *Nixon* did not rely on a federal common law right of access for its disposition and expressly restricted its discussion to the common law right of access to *judicial* records, without declaring recognition of any such federal right and repeatedly emphasizing that the right's contours were far from clear. The Supreme Court referenced only passingly that such a common law right might apply to nonjudicial records, with citations to a few state law cases. *Id.* at 597-98 & nn. 7, 8. Given *Nixon*'s barely-there recognition of a federal common law right of access to public records held by the Legislative or Executive Branches, eleven of the twelve federal circuits have recognized a federal common law right of access to *judicial records*, that is, documents filed in court or admitted as evidence, without extending any such access right to records held by other government entities.[3]

---

[3]    *See, e.g.*, *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 70 (1st Cir. 2011) (interpreting *Nixon* as applying only to "judicial records" from "civil and criminal trials"); *McCrary v. Marks*, 836 F. App'x. 73, 73-74 (2d Cir. 2021) (mem.) (briefly considering but not deciding whether the common law right of access extends to an executive branch agency); *In re ESML Hldgs. Inc.*, 135 F.4th 80, 93 (3d Cir. 2025) ("The scope of this common law right . . . turns on whether a particular document is considered to be a 'judicial record.'" (cleaned up)); *Under Seal v. Under* Seal, 230 F.3d 1354 (tbl.), 1354 (4th Cir. 2000) ("[T]he common law presumption in favor of access attaches to all judicial records and documents." (cleaned up)); *Test Masters Educ. Servs., Inc. v. Robin Singh Educ. Servs. Inc.*, 799 F.3d 437, 454 (5th Cir. 2015) ("The public has a common-law right to inspect and copy judicial records."); *United States v. Curry*, 641 F. App'x 607, 609 (7th Cir. 2016) (dismissing case seeking records under common law because seeker did "not want any *judicial* record, which [the Seventh Circuit has] defined to include materials submitted to the court that affect the disposition of the case" (emphasis in original) (cleaned up)); *Flynt v. Lombardi*, 885 F.3d 508, 511 (8th Cir. 2018) ("[T]here is a common-law right of access to judicial records," which is necessary for "the public's confidence in, and the accountability of, the judiciary" specifically.); *Demaree v. Pederson*, 887 F.3d 870, 884 (9th Cir. 2018) (articulating that the common law right applies when "a party [is] seeking to seal a judicial record" (cleaned up));

The D.C. Circuit has charted a different path.  Sixteen years after *Nixon*, the D.C. Circuit considered a common law claim seeking access to records held by an advisory group to the U.S. Sentencing Commission, which is located within the Judicial Branch but is not a court.  *WLF I*, 17 F.3d at 1447.  Without discussion, the D.C. Circuit assumed that the "common law right of access to public documents" could apply to the non-judicial records of the Sentencing Commission and outlined for the first time the two-step test discussed *supra* in Part I.A, *id.* at 1451-52, before remanding to the district court for application of that *WLF I* test, with the aid of a *Vaughn* index, *id.* at 1452.

When the case returned to the D.C. Circuit two years later, in 1996, the D.C. Circuit affirmed the district court's holding that the "documents sought by the WLF are not public records."  *WLF II*, 89 F.3d at 907.  In doing so, however, the D.C. Circuit laid the foundation for a broad view of the common law right of access, resting on a single line in *Nixon.  See id*. at 902 (characterizing *Nixon* as "unequivocal in stating that there is a federal common law right of access 'to inspect and copy public records and documents, including judicial records and documents'" (quoting *Nixon*, 435 U.S. at 597)).  Notwithstanding the fact that, since *Nixon*, the "common law right of access" had "almost always" been invoked "in cases involving access to court documents," the D.C. Circuit was "not persuaded by the narrow focus of the federal cases that the common law

---

*United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997) ("[J]udicial documents are presumptively available to the public, but may be sealed if the right to access is outweighed by the interests favoring nondisclosure."); *Comm'r, Ala. Dep't of Corr. v. Advance Local Media, LLC*, 103 F.3d 1161, 1166 (11th Cir. 2019) ("To determine whether Alabama's lethal injection protocol is subject to the common law right of access, we must first determine whether the protocol constitutes a judicial record."); *DePuy Synthes Prods., Inc. v. Veterinary Orthopedic Implants, Inc*., 990 F.3d 1364, 1369 (Fed. Cir. 2021) (holding that the common law right of access "helps secure the integrity and transparency of the judicial process"); *cf. In re Morning Song Bird Food Litig.*, 831 F.3d 765, 777-78 (6th Cir. 2016) (noting that the "common law right of access generally applies to all public records and documents, including judicial records and documents," but only reaching judicial documents).  The Sixth Circuit has suggested without reaching the issue that common law right of access claims may be available for nonjudicial records, the closest any other circuit has come to recognizing such an extension of the right.  *Carrelli v. Ginsburg*, 956 F.2d 598, 606 (6th Cir. 1992) (noting that an Ohio state government executive branch commission's practice of "issu[ing] a press release to the media that summarizes the decisions that it renders . . . comports with the established common law right of access to public records").

right is limited to records that are similar to court documents." *Id.* at 903 (cleaned up). Instead, the Circuit said, *Nixon*'s reference to "'public records and documents, including judicial records,'" "clearly implies that judicial records are but a subset of the universe of documents to which the common law right applies," pointing to the non-judicial records state law cases cited in a footnote in *Nixon*. *Id.* (quoting *Nixon*, 435 U.S. at 597 n.7). The Circuit then approvingly cited and adopted a prior district court holding that "all three branches of government, legislative, executive, and judicial, are subject to the common law right." *Id.* (quoting *Schwartz v. DOJ*, 435 F. Supp. 1203, 1203 (D.D.C. 1977) (Pratt, J.)).

Though the *WLF* plaintiffs were ultimately unsuccessful in being granted access to the requested records of the U.S. Sentencing Commission, the D.C. Circuit's reasoning spawned a line of cases in which plaintiffs sought records never filed in any court proceeding but held by non-judicial government entities. While courts "cannot craft federal common law when Congress has spoken directly to the issue at hand" and therefore the common law right of access to public records is inapplicable to Executive Branch agencies subject to FOIA, *Ctr. for Nat'l Sec. Studs. v. DOJ*, 331 F.3d 918, 937 (D.C. Cir. 2003), the D.C. Circuit has repeatedly reaffirmed the applicability of the federal common law right of access to the Legislative Branch and non-court Judicial Branch entities, *see, e.g.*, *id.* at 936 ("[T]he common law right of access extends beyond judicial records to the 'public records' of all three branches of government," including the Executive Branch until the right was preempted by FOIA.); *Hill v. Fed. Jud. Ctr.*, 238 F. App'x 622, 623 (D.C. Cir. 2007) (per curiam) (reversing district court's holding that amending complaint to add common law right claim against the Federal Judicial Center, a Judicial Branch entity, would be futile); *Schiff*, 998 F.3d at 993 (Henderson, J., concurring) (reiterating *WLF II*'s application of the common law right of access as a "federal common law right" that applies to "all three branches of government," but

concurring that the Speech or Debate Clause counseled against mandated disclosure of records sought from House Permanent Select Committee); *Schilling*, 102 F.4th at 507 ("reiterat[ing] that" the common law right of access "'extends . . . to the "public records" of all three branches of government,' . . . including the Legislative Branch" and mentioning the U.S. Capitol Police as an entity to which the right applies, but concluding the records sought were preliminary communications and therefore "not public records" (first omission in original) (quoting *Ctr. for Nat'l Sec. Studs.*, 331 F.3d at 936 (quoting *WLF II*, 89 F.3d at 903)); *Leopold*, 102 F.4th at 497; *Musgrave*, 104 F.4th at 360 ("The common law bestows upon the public a right of access to public records and documents . . . [that] extends to all three branches of government, legislative, executive, and judicial." (cleaned up)).  Nonetheless, the D.C. Circuit has repeatedly stopped short of actually enforcing the right's application to the Legislative Branch or non-judicial records of Judicial Branch entities (*i.e.*, the U.S. Sentencing Commission and the Federal Judicial Center). Indeed, the D.C. Circuit has "never applied the second-step balancing test to a common law right of access claim seeking non-judicial records," with the result that "'when we look for guidance concerning the application of this right[,] we find that we are in uncharted waters.'"  *Schiff*, 998 F.3d at 996 (Henderson, J., concurring) (alteration in original) (quoting *WLF II*, 89 F.3d at 903).

The Supreme Court addressed the common law right access for only the second time in 2013, rejecting the "sweeping claim that" the Privileges and Immunities Clause was violated by a state law denying non-State citizens the same "right of access to public information on equal terms with citizens."  *McBurney*, 569 U.S. at 232.  The Court further stated, without citation to *Nixon*, that "[n]o such right was recognized at common law" and that "[n]ineteenth-century American cases . . . do not support the proposition that a broad-based right to access public information was widely recognized in the early Republic."  *Id*. at 233.  The D.C. Circuit has not grappled with the

Supreme Court's most recent view of the common law right of access, as expressed in *McBurney*, but continues to identify a broad scope of the common law right of access that is described as predating the Constitution. *See Schiff*, 998 F.3d at 993 (2021) (Henderson, J., concurring) ("The right of access is 'a precious common law right . . . that predates the Constitution itself.'" (citing *Mitchell*, 551 F.2d at 1260); *see also Schilling*, 102 F.4th at 507 (2024); *Leopold*, 102 F.4th at 497 (2024); *Musgrave*, 104 F.4th at 360 (2025).

Meanwhile, the guidance from the D.C. Circuit in evaluating the right of access to *judicial* records has developed with more specificity in conducting the balancing required at the *WLF* second step—*i.e.*, after determining that the record at issue is a judicial record, then "balanc[ing] the government's interest in keeping the document secret against the public's interest in disclosure." *WLF I*, 17 F.3d at 1451-52; *see also WLF II*, 89 F.3d at 899 (summarizing earlier holding). In *United States v. Hubbard*, "recognizing this country's common law tradition of public access to records of a judicial proceeding," 650 F.2d 293, 314 (D.C. Cir. 1980) (citing *Nixon*, 435 U.S. at 597), the D.C. Circuit outlined six factors to consider when deciding whether to seal portions of judicial records or proceedings, *id.* at 315-22, which test is regularly applied in this Circuit, *see, e.g.*, *Abdelhady v. George Wash. Univ.*, 89 F.4th 955, 958-59 (D.C. Cir. 2024) (observing that "[w]e have repeatedly held that those are the factors a court should weigh in ruling on a motion to seal or unseal a judicial record," and remanding for abuse of discretion when "District Court misconstrued the record and appears not to have weighed all of the *Hubbard* factors" (internal quotation marks omitted)); *CNN, Inc. v. FBI*, 984 F.3d 114, 116, 118 (D.C. Cir. 2021) (discussing the "common-law right to access judicial records," stating "[f]or forty years, this Court has weighed that right's competing interests using a six-factor test first articulated in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980)," and

"acknowledg[ing] that this Circuit has not previously given the district courts sufficient guidance regarding the meaning of those factors"); *In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders* ("*In re Leopold*"), 964 F.3d 1121, 1127 (D.C. Cir. 2020) (explaining balancing of "strong presumption in favor of public access to judicial proceedings" that "may be outweighed by competing interests," noting, "[i]n *Hubbard*, we identified such interests, and subsequent cases crafted them into a six-factor test" (citations omitted)); *MetLife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 666 (D.C. Cir. 2017) ("In subsequent cases involving motions to seal or unseal judicial records, the *Hubbard* test has consistently served as our lodestar because it ensures that we fully account for the various public and private interests at stake.").[4]

In sum, the D.C. Circuit, relying on a much-quoted, single line in *Nixon*, which case was ultimately decided on different grounds than the common law right of access to public records, has developed a broad common law right to access public records. Mirroring other circuits, the D.C. Circuit has delineated the contours of this common law right's application to *judicial* records through repeated application in cases of sealing or unsealing evidence or filings submitted to

---

[4]     The common law right of access is not the only legal basis to support access to judicial records, since the Supreme Court has held that the First Amendment protects, for example, "the right to attend criminal trials [as] implicit in the guarantees of the First Amendment," and "presumptively" extends to civil trials as well. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 & n.17 (1980) (footnote omitted). On the other hand, "[n]o Supreme Court decision deals with the precise issue of the public's First Amendment rights to court records in civil cases." *See In re Reps. Comm. for Freedom of the Press*, 773 F.2d 1325, 1330-31 (D.C. Cir. 1985); *cf. Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984) (holding that a discovery protective order "entered on a showing a good cause . . . does not offend the First Amendment"). Against this backdrop, the D.C. Circuit has, in general, first decided whether the common law right of access, as assessed using the *Hubbard* factors, can provide the relief sought by a judicial record-seeker, before considering the First Amendment as an alternative ground for accessing judicial records if a record-seeker's common law right fails or if no common law claim was raised. *See, e.g., In re Leopold*, 964 F.3d at 1126 (common law question decided first to "avoid unnecessarily passing on a constitutional question" when the common law can provide the relief sought); *see also In re Los Angeles Times Commc'ns LLC*, 28 F.4th 292, 297 (D.C. Cir. 2022) (applying the "common law right of access" using the *Hubbard* factors and noting the court "need not . . . reach" the First Amendment issue); *CNN v. FBI*, 984 F.3d at 117 n.4 (similar); *In re Reps. Comm. for Freedom of the Press*, 773 F.2d at 1330 (considering First Amendment as basis for access where parties did not raise common law issue); *In re United States for an Ord. Pursuant to 18 U.S.C. 2705(b)*, No. 24-5239, 2026 WL 272213, at *4 (D.C. Cir. Feb. 3, 2026) (considering First Amendment argument when common law argument failed); *Dhiab v. Trump*, 852 F.3d 1087 (D.C. Cir. 2017) (considering First Amendment basis for unsealing when the District Court ruled in record-seeker's favor on that issue without reaching common law claim).

courts.  In contrast to other circuits, the D.C. Circuit has repeated that this right extends to non-judicial records, including Legislative Branch records, though, to date, without commanding the release of such records or clarifying how the ministerial duty prerequisite for mandamus relief may be met in this context.[5]  Nor has the D.C. Circuit outlined, as the *Hubbard* factors operate for *judicial* records, how the second-step of the *WLF I* test should be applied to *non-judicial* public records, though one Circuit Judge has indicated that an abbreviated *Hubbard* factor analysis may apply.  *See Schiff*, 998 F.3d at 996 (Henderson, J., concurring) (suggesting that "[t]he first five *Hubbard* factors provide helpful guidance for balancing the interests at stake here as well," when analyzing balancing of interests under *WLF I* and *II* for public access to congressional subpoenas).[6]  With these open questions in mind, the instant parties' dispute is discussed next.

**B.    Defendant's Motion to Dismiss**

The parties repeat the same bases for and against dismissal of the Complaint as asserted in the prior litigation seeking disclosure of 101 USCP policy directives.  Specifically, defendant argues that the doctrine of sovereign immunity bars the exercise of jurisdiction over defendant, as a Legislative Branch officer sued in his official capacity.  Def.'s MTD at 9.  Plaintiff counters that

---

[5]    Additionally, the D.C. Circuit has only ever considered the common law right of access to non-judicial public records held by federal entities, without clarifying whether such a right could be used to compel disclosure of records by state entities, such as state police departments, if federal court subject matter jurisdiction could be established.  *See WLF II*, 89 F.3d at 898 (interpreting the common law right of access "[a]t least as it applies to the federal government").  Few other courts have considered the issue, perhaps because other courts have not expanded the common law right of access beyond judicial records.  The Supreme Court has made clear that the common law right of access is "no[t] constitutional" and therefore cannot be the basis for challenging limitations in a state's public disclosure statute under the Privileges and Immunities Clause of the Constitution.  *McBurney*, 569 U.S. at 232.

[6]    Judge Henderson identified the following five *Hubbard* factors as guides in weighing the public and Congress's competing interests at stake in applying the common law right of access to disclosure of the congressional subpoenas: "(1) The need for public access to the documents at issue; (2) the extent of previous public access to the documents; (3) the fact that someone has objected to disclosure, and the identity of that person; (4) the strength of any property and privacy interests asserted; [and] (5) the possibility of prejudice to those opposing disclosure."  *Schiff*, 998 F.3d at 996 (Henderson, J., concurring) (alterations accepted); *id.* at 996-99 (discussing application of these five factors).

the *Larson-Dugan* exception to sovereign immunity applies since defendant acted in breach of a duty created for him by the D.C. Circuit's articulation of the federal common law right of access by withholding in whole or in part the requested policy directives.  Pl.'s Opp'n at 7-19.  As in the prior litigation, the jurisdictional question merges with the merits in this case and, as resolved by the D.C. Circuit and binding on this Court, 36 USCP policy directives not deemed by the Capitol Police Board to be "security information" are "public records," *Leopold*, 102 F.4th at 500, and the remaining 65 USCP policy directives are not subject to the common law right of access to the extent they contain "security information," *id*. 501-02; *see Leopold*, 630 F. Supp. 3d at 83. Defendant concedes that, if the common law right of access applied to the 65 security-information directives, they would qualify as "public records" for the purposes of the first step of the *WLF* test, *see* Def.'s MTD at 4-5, because like the 36 non-security-information directives, they "memorialize an official action (the creation and adoption of a policy)," *Leopold*, 102 F.4th at 500.

Proceeding, therefore, to the merits, plaintiff "must clear three high hurdles," *Leopold*, 102 F.4th at 497, to establish a plausible claim for issuance of a writ of mandamus.[7]  First, plaintiff must show that there are "no other adequate means to attain" the relief sought.  *Leopold*, 102 F.4th at 497 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004)).  Second, "he must show that his 'right to issuance of the writ is clear and indisputable,' and that its issuance will compel the government official to perform a 'ministerial duty.'"  *Id.* (citations omitted) (quoting *Cheney*, 542 U.S. at 381, then *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996)); *Lovitky v.*

---

[7]     28 U.S.C. § 1361 gives district courts original jurisdiction over "action[s] in the nature of mandamus."  *Id.* As discussed by the D.C. Circuit in *Leopold*, "a few decisions from other courts of appeal . . . limit Section 1361 jurisdiction to Executive Branch officials.  102 F.4th at 494.  "[W]ithout deciding that these decisions are correct," the D.C. Circuit "construe[d] Mr. Leopold's invocation of Section 1361 as an application for a mandatory injunction under the federal-question statute, 28 U.S.C. § 1331."  *Id.*  A mandatory injunction is "judged by the same principles as [a] request for mandamus."  *Id.* (alteration in original) (quoting *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996)). Plaintiff's request is thus discussed as one for mandamus, though jurisdiction technically arises under the federal question statute, adopting the D.C. Circuit's approach in *Leopold*.

*Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (noting that the "clear right to relief and clear duty to act" are "often" analyzed "concurrently").  To clear this second hurdle, plaintiff must both have a "clear and indisputable" right to relief on the merits of his substantive claim—here, a claim for production of records under the common law right of access, assessed under the two-step *WLF I* test, *Leopold*, 102 F.4th at 497, 499 (citing *WLF I*, 17 F.3d at 1451-52)—and show that the duty that must be fulfilled to vindicate his right "admits of no discretion, so that the official in question has no authority to determine whether to perform the duty," *Swan*, 100 F.3d at 977.  As the D.C. Circuit said, for mandamus to issue, the "law must not only authorize the demanded action, but require it." *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 602 (D.C. Cir. 1974).

Finally, "even if the first two prerequisites have been met, the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381.  The first two hurdles constitute "legal requirements for mandamus jurisdiction" and "are jurisdictional," so if they are not met, "a court must dismiss the case for lack of jurisdiction." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  Even if a petition for mandamus meets those two jurisdictional requirements, the plaintiff is ultimately entitled to "relief only when [the Court] finds compelling equitable grounds" to issue the writ. *Id.* (internal quotation marks and citation omitted); *see Nat'l Treasury Emps. Union*, 492 F.2d at 616 (declining to issue writ of mandamus to the President, even though jurisdictional requirements were met, and instead issuing declaratory judgment, "in order to show the utmost respect to the office of the Presidency").

Defendant challenges only whether plaintiff satisfies the first two jurisdictional hurdles, which are addressed *seriatim*.[8]

### 1. First Mandamus "Hurdle": No Other Adequate Means

The first "hurdle" is contested by defendant only as to two security-information policy directives—Directive 1000.002 (Retrieval of Archived Video) and Directive 1053.002 (Vehicular Pursuits). Defendant contends that plaintiff already has copies of these two directives, as evidenced by the fact that plaintiff attached these two documents as exhibits to the Complaint. Def.'s MTD at 10-11; *see* Compl., Ex. B, "Retrieval of Archived Video" Directive (Feb. 6, 2015), ECF No. 1-3; *id.*, Ex. C, "Vehicular Pursuits" Directive (Apr. 15, 2003), ECF No. 1-4. Defendant's contention is correct as to one but not the other of these two policy directives. Specifically, plaintiff has a copy of "Retrieval of Archived Video" that USCP averred and plaintiff conceded in prior litigation was in effect on January 6, 2021, and he therefore is not entitled to mandamus directing re-release of that document. *See* Defs.' Statement of Material Facts as to Which There Is No Genuine Issue ¶ 7, *Leopold v. Manger*, No. 21-cv-465 (D.D.C. filed Sept. 30, 2021), ECF No. 19-1 ("Defs.' Prior SF"); Pls.' Response to Defs.' Statement of Material Facts as to Which There Is No Genuine Issue ¶ 7, *Leopold v. Manger*, No. 21-cv-465 (D.D.C. filed Nov. 12, 2021), ECF No. 21-2 ("Pls.' Prior SF Resp.").[9]

As to the "Vehicular Pursuits" directive, defendant has not represented that the copy in plaintiff's possession is the same version in effect on January 6, 2021, a date that is 18 years after

---

[8]    Defendant presents no argument for dismissal based on the third hurdle, *see generally* Def.'s MTD, which, in any event, does not implicate this Court's jurisdiction but rather whether relief should issue, *see Am. Hosp. Ass'n*, 812 F.3d at 189, and thus is not considered at the motion to dismiss stage.

[9]    Plaintiff also appears to possess the non-security-information Directive 2053.013 (Rules of Conduct), which defendant represented and plaintiff conceded in prior litigation is the same version in effect on January 6, 2021. *See* Defs.' Prior SF ¶ 7; Pls.' Prior SF Resp. ¶ 7. Defendant does not challenge whether plaintiff has an adequate alternative means to obtain this directive, however, so plaintiff is assumed at this stage to clear the first hurdle as to this document.

publication of the version of the directive plaintiff attached to the Complaint. *See* Def.'s MTD at 10; "Vehicular Pursuits" Directive (showing publication date of April 15, 2003). Plaintiff therefore clears the first hurdle as to the "Vehicular Disputes" directive, as well as the other 99 directives, because he lacks an adequate alternative means to obtain those documents.[10]

### 2. Second Mandamus "Hurdle": Clear and Indisputable Right to Writ

Whether plaintiff meets the second hurdle, by showing a "right to issuance of the writ [that] is clear and indisputable, and that its issuance will compel the government official to perform a ministerial duty," *Leopold*, 104 F. 4th at 497 (cleaned up), is the crux of the dispute between the parties at this motion to dismiss stage. Recall that in resolving this dispute, the D.C. Circuit left open questions, including (1) whether the public's interest in disclosure outweighs the government's interest in secrecy, without which showing plaintiff does not have a right to relief at all, much less one that is clear and indisputable, and (2) if the answer to the first question is affirmative, whether the common law right of access creates a ministerial duty to produce the 36 non-security-information directives and to produce the 64 remaining security-information-containing directives, with security information segregated and redacted. *Leopold*, 102 F.4th at

---

[10]     USCP has "newly established" a "mechanism for obtaining documents from the Capitol Police," Def.'s MTD at 5, prompted by the House Appropriations Committee's admonition after the January 6 attack, *id.* at 3. Plaintiff responds to defendant's charge that plaintiff "did not utilize this newly established mechanism for obtaining documents from the Capitol Police" prior to filing the instant action, *id.*, explaining that the House Committee's instructions "lack the force of law" and therefore do not displace the common law right of access, Compl. ¶ 58 n.2 (citing *Associated Elec. Co-op., Inc. v. Morton*, 507 F.2d 1167, 1174 (D.C. Cir. 1974)), and insisting that use of that process would be "futile," given USCP's limits on the "voluntary" disclosure process, *id.* Without relying on this administrative process as a basis for dismissal due to providing another "adequate means to attain" relief, defendant reserves the possibility of raising that defense "[o]n a different standard of review," Def.'s MTD at 10, presumably because at this stage, taking all of plaintiff's factual assertions as true, it must be assumed that any attempt to obtain these directives through that process would be futile. Also, following January 6, 2021, a few congressmembers publicly discussed extending FOIA to cover USCP, *see* Def.'s MTD at 2 (citing an interview with Representative Zoe Lofgren), which would have both displaced the common law right of access and created a defined process for records requests, *see Musgrave*, 104 F.4th at 360 (noting that "with respect to documents in the Executive Branch, [the common law right] has been displaced by FOIA"), but to date this proposed FOIA extension has not been enacted.

497-98, 500.  Though jurisdiction rises or falls on the resolution of these merits questions, few tools are available to tackle the first question about balancing the interests in secrecy versus disclosure without the benefit of a record containing detailed declarations of the kind relied upon in the prior litigation, *see Leopold*, 630 F. Supp. 3d at 85, much less the *Vaughn* index the D.C. Circuit suggested "likely would . . . aid[] the District Court's analysis," *Leopold*, 102 F.4th at 500. Also, the D.C. Circuit provided little guidance on the second question about the extent to which disclosure is a ministerial or discretionary duty on defendant, though acknowledging this to be a "novel mandamus issue."  *Id.* at 498.

Despite these challenges arising from this case's current posture, for the reasons explained below, after addressing these two questions left open by the D.C. Circuit, plaintiff has stated a plausible claim for mandamus relief as to the remaining 100 USCP policy directives and has made enough of a showing to survive a motion to dismiss for lack of subject-matter jurisdiction.

### a. Balancing of Public and Government Interests

To state a viable claim for the mandamus relief he seeks, plaintiff must plausibly allege his likelihood of success on both prongs of the *WLF I* test to show that he has a "clear" right to relief. *Leopold*, 102 F.4th at 497.  The D.C. Circuit held that plaintiff succeeds in the first step—whether the directives are "public records"—as to the 36 non-security-information directives, because they "memorialize an official action (the creation and adoption of a policy)," *Leopold*, 102 F.4th at 500, which definition applies with equal force to the remaining 64 USCP policy directives that contain "security information," as acknowledged by defendant, Def.'s MTD at 4-5.

The D.C. Circuit left open, on the other hand, whether plaintiff succeeds as to the second, balancing-test step of the *WLF I* test.  *See Leopold*, 102 F.4th at 500.  Defendant does not contest, at this stage, whether plaintiff has satisfied this second step as to any of the 100 remaining

directives or information contained therein, instead arguing that "the Court should not reach the balancing test described in *WLF I*." Def.'s Reply at 4. *See generally* Def.'s MTD (not mentioning the balancing test). The D.C. Circuit opined that "a *Vaughn* index likely would . . . aid[] the District Court's analysis" of the balance between the public's interest in disclosure and government's interest in secrecy. *Leopold*, 102 F.4th at 500. At this stage, no such index has been provided—indeed, the record is far thinner than the record in prior litigation, where the Court could rely on detailed declarations from the custodians of the documents at issue. *See Leopold*, 630 F. Supp. 3d at 84-85 (relying upon declarations from defendants describing the contents of contested documents).

Even when jurisdiction is at stake, at the motion to dismiss stage, a court must "construe the complaint liberally, granting plaintiff[] the benefit of all inferences that can be derived from the facts alleged." *Hemp Indus. Ass'n*, 36 F.4th at 281 (internal quotation marks and citation omitted). Without the benefit of much record in the instant case, much less a *Vaughn*-type index enumerating the reasons defendant seeks to withhold the requested documents, in whole or in part, plaintiff has plausibly alleged that the directives may be subject to disclosure because of the public's interest in the policies and procedures of the USCP in effect at the time of the January 6, 2021, attack on the U.S. Capitol. To be sure, defendant asserted compelling reasons for nondisclosure, including that all 101 directives sought are "Law Enforcement Sensitive," which, on the prior record, this Court concluded outweighed the public's "minimal" interest in at least the 36 non-security-information directives. *See Leopold*, 630 F. Supp. 3d at 85. In the D.C. Circuit's view, however, that prior balancing "failed to analyze 'each category of documents requested'" and was undertaken "'without knowing precisely what records were at issue,'" *Leopold*, 102 F.4th at 500 (quoting *WLF I*, 17 F.3d at 1452), though the D.C. Circuit neither acknowledged that these

documents were marked "Law Enforcement Sensitive," nor provided any specific guidance on how to balance the public's interest in disclosure against law enforcement's secrecy interests. Under this binding precedent, plaintiff may be able to show that the public's interest in disclosure outweighs the government's interest in secrecy as to at least some of the directives or information contained therein. Thus, the balancing test does not provide grounds for dismissal at this stage, because plaintiff has plausibly alleged that he will be able to show that he has a clear right to relief on the merits of the two-step *WLF I* test.

### b. Clear and Indisputable Nondiscretionary Duty

Survival of plaintiff's complaint turns on whether he has successfully identified and plausibly pleaded a "clear and indisputable, nondiscretionary duty" for defendant to release the requested records. *Leopold*, 102 F.4th at 501. "[I]t is only when the duty of the officer to do the act is clear-cut, well-defined, and positive that it is considered ministerial and compellable by mandamus." *United States ex rel. Roughton v. Ickes*, 101 F.2d 248, 252 (D.C. Cir. 1938). Courts must not, through mandamus, "guide and control [an officer's] judgment or discretion in the matters committed to his care, in the ordinary discharge of his official duties." *Decatur v. Paulding*, 39 U.S. 497, 503 (1840); *see also Kendall*, 37 U.S. at 610 ("The mandamus does not seek to direct or control the [officer] in the discharge of any official duty, partaking in any respect of an executive character; but to enforce the performance of a mere ministerial act, which . . . he . . . [did not have] any authority to deny or control."). Nonetheless, a "writ may issue to compel . . . officers to perform purely ministerial duties when imposed upon them by law, . . . even [when] the refusal of an officer to perform the act is based on an erroneous construction by him of the statute." *McCarl v. United States ex rel. Societa Ligure di Armamento*, 30 F.2d 561, 563 (D.C. Cir. 1929). In other words, when the alleged duty arises under a statute, "mandamus actions are [not]

ruled out whenever the statute allegedly creating the duty is ambiguous." *Lovitky*, 949 F.3d at 760 (quoting *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005)). Instead, "the court must interpret the statute and if, 'once interpreted,' the statute 'creates a peremptory obligation for the officer to act, a mandamus application will lie.'" *Id.* (quoting *13th Reg'l Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980)).

To assess the nature of the duty to disclose records imposed by the common law right of access on a government official, including whether the duty is discretionary or ministerial, the D.C. Circuit has instructed that the district court "look for the contours of the right of access in the common law of the states" and attempt to find "common ground" between them. *WLF II*, 89 F.3d at 904-05. More recently, in *Leopold*, the D.C. Circuit observed that "courts have taken differing approaches when it comes to determining whether the decision to provide access to a public document is ministerial or discretionary," citing state court cases from Arizona, Georgia, Florida, Maryland, North Carolina, Wisconsin and Wyoming, but "express[ing] no views on these issues." 102 F.4th at 498. When determining D.C. common law, Maryland common law is generally deemed highly probative. *See Conesco Indust., Ltd. v. Conforti & Eisele, Inc., D.C.*, 627 F.2d 312, 315-16 (D.C. Cir. 1980) ("[T]he District of Columbia derives its common law from [Maryland,] and . . . District of Columbia courts have in the past looked to Maryland law for guidance."). Yet, the D.C. Circuit has eschewed restricting the substantive contours of the *federal* common law right of access to the common law of the District of Columbia or neighboring Maryland, and given no particular preference to local common law. *See, e.g.*, *WLF II*, 89 F.3d at 904 (construing the definition of "public records" subject to the common law right without citing any D.C. or Maryland cases); *Leopold*, 102 F.4th at 498 (pointing to states' common law as a source for determining whether the duty to disclose is ministerial while citing no D.C. cases and one Maryland case,

among others); *see also Continental Transfer Technique, Ltd. v. Fed'l Gov't of Nigeria*, No. 08-cv-2026 (PLF), 2019 WL 3562069, *9 (D.D.C. Aug. 6, 2019) (noting that "[r]ather than tracking the local law of any single state," federal common law "reflect[s] state law in general; what matters is how most states do things, not whatever the policymakers in one particular state have said," and collecting cases applying this principle (internal quotation marks omitted)).

Crediting at this stage that plaintiff's allegations as to success on the balancing prong of the *WLF I* test as to the 36 non-security-information directives and the non-security-information portions of the other 64 directives, *see supra* Part III.B.2(a), the remaining question is whether plaintiff has identified a ministerial duty to (1) release the 36 non-security-information directives that are subject to the common law right of access; and (2) release portions of the 64 remaining security-information directives that are subject to the common law right of access, with redactions of information as to which the common law right of access is displaced by statute.

### (i) 36 Non-Security Information Directives

The 36 directives not containing security information are public records under binding precedent, *Leopold*, 102 F.4th at 500, and plaintiff has plausibly alleged that the need for public access may outweigh the government's need for secrecy under the balancing-test second step of the *WLF I* analysis as to at least some of these directives, *see supra* Part III.B.2(a). Plaintiff argues that defendant "has a nondiscretionary duty to make those records available to the public unless this Court determines [at the second step] that 'specific interests favoring secrecy outweigh the general and specific interests favoring disclosure.'" Compl. ¶ 5 (quoting *WLF I*, 17 F.3d at 1451); Pl.'s Opp'n at 9.  Defendant responds that "[w]ithout an applicable statute or regulation" delineating defendant's clear duty to release the requested records, "Plaintiff's claim fails."  Def.'s MTD at 13.

Plaintiff points to no statute or regulation as the source of a nondiscretionary duty requiring defendant to release USCP non-security-information, such as these 36 non-security-information directives. *See* Compl. ¶¶ 50-59.[11]    Indeed, plaintiff only asserts that defendant "has a nondiscretionary duty *under the common law* to release th[e]se records," Compl. ¶ 53 (emphasis added), relying on D.C. Circuit precedent affirming and describing the public's common law right to inspect public records, *id.* ¶¶ 2-4.  This binding precedent makes clear that the common law right of access can provide the basis for mandamus relief.  *See Leopold*, 102 F.4th at 495-96 ("Courts can enjoin or direct the actions of a government official," including via mandamus, "so long as that action is not also the action of the sovereign," including when the official fails to carry out "common law duties." (cleaned up)); *see also Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305, 313-14 (D.D.C. 2020) (collecting authorities for the proposition that "the relevant duty" in a similar mandamus case is "potentially created by the common-law right itself").  Defendant's argument that the absence of any statute or regulation imposing a public access duty on USCP resolves this issue and warrants dismissal ignores binding precedent providing that the common law is an additional legal source for the duty to disclose public records.  Specifically, when mandamus is sought based on a duty compelled by common law, rather than by statute, "the court must interpret" the contours of the common law right and counterpart duty, and "if, 'once interpreted,'" the common law "'creates a peremptory obligation for the officer to act, a mandamus application will lie.'"  *Lovitky*, 949 F.3d at 760 (quoting *13th Reg'l Corp.*, 654 F.2d at 760); *see WLF II*, 89 F.3d at 904-907 (surveying state common law and other sources to delineate the bounds of the common law right of access); *Schiff*, 474 F. Supp. 3d at 315-316 (deciding whether

---

[11]    2 U.S.C. § 1979 is not the source of such a duty because that section, titled "release of security information," deals only with "security information," as defined in the statute, and therefore does not authorize, mandate, or prohibit the release of non-security-information.

documents were subject to the common law right of access such that mandamus could issue to compel their release).

Plaintiff persuasively argues that binding D.C. Circuit precedent recognizes a common law "nondiscretionary duty to make . . . records available to the public" when those records satisfy the two-step *WLF I* test. *See* Compl. ¶ 5. The D.C. Circuit has expressly stated that a document satisfying both prongs of the *WLF I* test "must be disclosed pursuant to the common law right of access." *WLF II*, 89 F.3d at 902. A court order to disclose a record removes defendant's discretion to do otherwise. Such a court order directs a defendant "to perform an act in regard to which no discretion is committed to him and which, upon the facts existing, he is bound to perform, then that act is ministerial." *Nat'l Treasury Emps. Union*, 492 F.2d at 602 (quoting *Roberts v. United States*, 176 U.S. 219, 231 (1900)); *see also WLF I*, 17 F.3d at 1451-52 (noting that "the court," not the record custodian, should assess whether each prong is satisfied). The duty is therefore ministerial, and mandamus may lie to compel its completion.[12]

---

[12] This conclusion is bolstered by state cases cited by plaintiff showing that record disclosure requirements, whether imposed by statute or common law, generally leave no discretion with the custodian of the records about whether to release particular documents, unless the legislature statutorily delegates such discretion to the custodian. *See* Pl.'s Opp'n at 9-11 (citing *Clement v. Graham*, 78 Vt. 290, 63 A. 146 (1906) ("[T]o inspect the public records and public documents there kept is a right which rests with the citizens and taxpayers of the state. . . . [C]orrelative to this right, it is a legal duty which the [official holding the records] owes to the public by virtue of his office to accord that right . . . . This duty is ministerial in its nature, and so clear and specific that no element of discretion nor of official judgment is involved in its performance."); *State v. Williams*, 75 S.W. 948, 959 (Tenn. 1903) ("[T]he granting of permission to make the examination rests in the sound discretion of the court, in the form of granting or withholding the writ of mandamus," after court has considered factors such as "the safety of the books and records" and the "grav[ity] and importan[ce]" of the need for examination.); *Ferry v. Williams*, 41 N.J.L. 332, 334 (Sup. Ct. 1879) ("[T]he court is by no means disposed to narrow its authority to enforce by *mandamus* the production of every document of a public nature in which any citizen can prove himself to be interested. For such persons, indeed, every officer appointed by law to keep records ought to deem himself for that purpose a trustee."); *Nowack v. Fuller*, 243 Mich. 200, 208-09 (1928) ("By denying [plaintiff] access to the public records for the purpose of securing such information, he is deprived of legal rights for which he is entitled to redress by the writ of mandamus. It is the plain duty of the auditor general to exhibit his official records to any citizen of Michigan who desires to inspect them for any proper and lawful purpose, in circumstances not detrimental to the public business."); *Fla. Soc'y of Newspaper Eds., Inc. v. Fla. Pub. Serv. Comm'n*, 543 So. 2d 1262, 1264 (Fla. Dist. Ct. App. 1989) (observing that "[i]n most cases, a determination of exemption from the Public Records Act does not involve an exercise of discretion" and thus "mandamus will lie to compel th[e] ministerial act" of releasing non-exempt records as identified by the court, but statutory provisions exempting material "determined by the [executive branch] commission" to be "trade secrets" expressly grant discretion to the custodian of the records).

Defendant resists this conclusion, contending that for mandamus relief the duty must be "clear and indisputable" and, "[e]ven if the Court were to conclude that prior cases announcing the common law could create a clear and indisputable duty in the absence of a statutory directive, Plaintiff has failed to identify any case law anywhere that has held that the Capitol Police has a clear and indisputable duty to disclose these records." *Id.* at 13. For the purposes of this motion to dismiss, the ship sailed on defendant's argument that no clear duty exists when the D.C. Circuit held that these 36 directives were public records and that "a *Vaughn* index likely would . . . aid[] the District Court's analysis" in the second step of the *WLF* test. 102 F.4th at 500. Although whether the duty applies to a specific document will depend upon the results of the second-step balancing test, which cannot be conducted on the limited record before the Court, common sense and binding precedent dictate that if plaintiff's allegations are true—that the public's interest in the records outweighs the government's interest in secrecy—as to some or all of the directives those directives, in whole or in part, are subject to the common law right of access. Defendant's discretion to withhold these documents must then give way to the ministerial duty of complying with a court order to release the documents. As the D.C. Circuit said in *WLF II*, if a plaintiff succeeds in the "two-step inquiry" laid out in that case, the "document must be disclosed." *WLF II*, 89 F.3d at 902; *see id.* at 903 n.* (noting that a court may "requir[e] disclosure of the document under the common law"); *Schiff*, 474 F. Supp. 3d at 312 ("Should the common-law right of access apply to the requested records, then [the government's] exercise of discretion . . . whether to release those records to plaintiff would be cabined accordingly by the legal duty or obligation to fulfill plaintiff's requests."). The fact that the contours of a duty or its application to the facts require "careful[] analy[sis]" does not "render [the] duty . . . other than ministerial." *Nat'l Treasury Emps. Union*, 492 F.2d at 602. Instead, the question is whether defendant has the "authority" to decide

whether to act.  *Id.*  Here, he would not in the face of a court order to disclose.  Defendant's argument that plaintiff must identify a case holding that USCP has a duty to release these particular records is, as plaintiff says, "transparently circular."  *See* Pl.'s Opp'n at 8.  What matters is that binding case law creates a common law duty to release records determined by a court to satisfy both prongs of the *WLF I* test, and that, after such judicial determination, the duty to release records is not subject to defendant's discretion.[13]

Accordingly, plaintiff has plausibly alleged that the 36 non-security-information directives are public records, disclosure of which may satisfy the *WLF I* test, and thereby result in defendant's clear and indisputable duty to produce the directives to comply with the court order to do so, since such compliance is a ministerial duty that "admits of no discretion."  *See Swan*, 100 F.3d at 977. Since plaintiff has no other adequate means to obtain this relief, he has stated a claim for the first two jurisdictional prongs for mandamus and has successfully invoked the *Larson-Dugan* exception to the sovereign immunity bar on jurisdiction.  His claims as to these directives therefore survive dismissal.

### (ii) 64 Security-Information-Containing Directives

In addition to the 36 directives that USCP concedes contain no "security information," as defined in 2 U.S.C. § 1979(a), plaintiff seeks disclosure of redacted versions of 64 remaining directives that USCP avers contain security information.  Compl. ¶ 44.  Again, at this stage defendant does not assert either prong of the *WLF I* test as a basis for dismissal, conceding that insofar as the common law right of access applies to these 64 directives at all, they qualify as "public records" and that the Court should not reach the second-step balancing test as to any non-

---

[13]     Given the spare guidance in *Leopold*, any additional inquiry envisioned or intended by the D.C. Circuit to assess a record custodian's ministerial duty to provide access to public records under the common law right of access, is elusive.

security-information portions at the motion to dismiss stage. Def.'s MTD at 4-5. Defendant disputes that the common law right of access creates a clear and indisputable duty to segregate and redact statutorily protected information—akin to the statutory requirement imposed on Executive Branch agencies to release reasonably segregable, non-exempt information, under FOIA, 5 U.S.C. § 552(b) (sentence immediately following exemptions)—much less a ministerial duty as required for mandamus. In response, plaintiff argues that, if any information in these 64 directives is subject to the common law right of access, defendant "has a nondiscretionary duty" under the common law to "make public appropriately redacted documents." Compl. ¶ 54 (cleaned up).

Again, plaintiff points to no statute as the source of a ministerial duty to segregate non-security information from records otherwise protected from disclosure as security information, absent the Capitol Police Board's permission, under 2 U.S.C. § 1979(a), (b). Though leaving the release of security information to the Capitol Police Board's discretion, this statute says nothing about the release of non-security-information within the same document. As this Court found, and the D.C. Circuit left undisturbed in previous litigation, the common law duty of access is therefore displaced by 2 U.S.C. § 1979(b) as to security information. Put another way, because Congress has specifically empowered the Capitol Police Board to decide when security information should be released, the common law right does not apply. *See Leopold*, 630 F. Supp. 3d at 82-83.

Plaintiff does not contest that security information is not subject to the common law right of access, *see* Pl.'s Opp'n at 15 ("2 U.S.C. § 1979(b)—which prohibits the release of 'security information'—displaces the common law in relevant part . . . ."); Compl. ¶ 37 (seeking only "reasonably segregable portions of the 65 directives containing 'security information'"), but he raises two concerns with the conclusion urged by defendant that the Capitol Police Board's decision not to release these documents is dispositive. First, while the Capitol Police Board is

statutorily empowered, under 2 U.S.C. § 1979(b), to decide *whether* "security information" should be released, plaintiff contends the Board is not empowered to decide *which* information constitutes "security information" in the first place.  Compl. ¶ 46.  Instead, he argues, the statute provides a definition of "security information" that must be interpreted and applied by the Court.  *Id.*  Plaintiff's view of the extent of the Capitol Police Board's authority is generally correct. Thus, in prior litigation, the reasonableness of the Board's determination was reviewed, though without a deep dive, time-intensive, *in camera* review of the individual directives at issue, which is a type of review not even required in application of FOIA exemptions.  *See* 565 F.3d at 870 (declining to order document-by-document, *in camera* review of redactions under FOIA).  Relying on evidence in the form of declarations submitted by the defendant at the summary judgment stage, this Court concluded that the 65 directives USCP designated as "security information" were "proper[ly]" so designated.  *Leopold*, 630 F. Supp. 3d at 83, and this conclusion was not disturbed on appeal, *Leopold*, 102 F.4th at 501 (noting that "Mr. Leopold argues that there is insufficient evidence in the record that supports designating these documents as 'security information'" but ultimately affirming this Court's decision without overturning its finding that the designation was proper).

Second*,* he asserts that the statute displaces the common-law right of access only as to "security information" itself, not as to the entirety of any document that contains security information, and that the Court should therefore apply the two-step *WLF I* test to portions of the directives determined not to be security information and direct USCP to produce copies of those directives with security information redacted.  Pl.'s Opp'n at 15.  When this argument was raised on appeal, the D.C. Circuit "reject[ed]" plaintiff's "request for a remand to the District Court where the government would be ordered to segregate and disclose those portions of the withheld documents that do not contain security information," at the same time acknowledging that "[t]he

pathway to the necessary conclusions is not intuitive," *Leopold*, 102 F.4th at 502, leaving another open question as to what extent the common law right of access imposes a clear duty for segregation and redacted release of records.

As a start in answering this question, the plain text of 2 U.S.C. § 1979 protects only "security information" itself, not surrounding non-security-information contained in the same document as security information. *See* 2 U.S.C. § 1979(b). Neither in the prior litigation nor in the instant motion to dismiss is evidence available explaining whether or why USCP asserts that the entirety of the 64 remaining security-information-designated directives constitute security information. Drawing all inferences in plaintiff's favor, he has alleged that at least some portions of these 64 directives may not be security information, as defined by statute. *See* Compl. ¶ 55 ("Defendant cannot demonstrate . . . that the 65 directives that USCP argues contain some 'security information' consist entirely of 'security information' . . . .").

The D.C. Circuit has never addressed whether the common law right to access nonjudicial public documents includes a right to redacted copies of documents, some portions of which are not subject to disclosure. *See Musgrave*, 104 F.4th at 360 ("[T]he nature and scope of the common law right of access to documents in the Legislative Branch is relatively undeveloped.").[14] Following the direction of the D.C. Circuit to look at the common law of the various states, *see supra* Part III.B.2(b)(i), plaintiff cites a mix of federal and state cases for the proposition that the common law duty to disclose public records may require redaction, Pl.'s Opp'n at 14 & n.4, whereas defendant merely cites to *Leopold*'s observation that the "pathway to the necessary conclusions is not intuitive" as evidence that the duty is less than clear, without making any other

---

[14]    Though not at issue in this motion to dismiss, the same problem of the duty to redact may arise after the Court balances the government and public interest, if the Court concludes that any portion of the 100 remaining directives should not be disclosed. *See* Compl. ¶ 54 (arguing that the government will also have a duty to redact any portions of directives that cannot be released in their entirety after the balancing test).

arguments about the contours of the common law access right and whether this right encompasses a duty to segregate and release redacted public records, Def.'s MTD at 15.

Binding precedent in this Circuit governing the common law right of access to *judicial* records provides a paradigm applicable here.  The D.C. Circuit has admonished that "although administrative burden"—including the need for a government record custodian to "redact documents in order to protect privacy and law enforcement interests"—"is relevant to how and when documents are released, it does not justify precluding release forever."  *In re Leopold*, 964 F.3d at 1133-34.  In that case, the Court required disclosure of redacted copies of sealed electronic surveillance applications and orders, issued over the preceding twenty years and going forward, pursuant to the Stored Communications Act (SCA), 18 U.S.C. § 2703, and the Pen Register Act, 18 U.S.C. §§ 3127, as required under the common law right of access to public records.  *In re Leopold*, 964 F.3d at 1133-34.  Thus, the common law duty to release judicial records exists even when the preliminary step of redaction must be taken to protect information for which good reason requires nondisclosure.  *See also* Pl.'s Opp'n at 14 n.4 (citing cases from each federal circuit requiring redaction pursuant to the common law right of access to judicial records).  This supports the proposition that a duty to release nonjudicial public records includes a duty to redact and release records containing non-public information, a conclusion consistent with state common law, to the limited extent the parties have identified state cases grappling with the issue.  *See* Compl. ¶ 45 (citing *Wisconsin ex rel. Youmans v. Owens*, 137 N.W.2d 470, 475 (Wis. 1965), holding that "[i]f a single record or document is sought to be inspected, and disclosure of only a portion is found to be prejudicial to the public interest, the trial judge has the power to direct such portion to be taped over before granting inspection"); *see also Rivera v. Union Cnty. Prosecutor's Off.*, 250 N.J. 124, 151 (2022) (ordering release of redacted police department internal affairs reports held by

prosecutor's office under the common law right of access); *Keddie v. Rutgers State Univ.*, 148 N.J. 36, 52 (1997) (same for records about labor disputes held by public university); *Clark Cnty. Sch. Dist. v. Las Vegas Rev.-J.*, 134 Nev. 700, 706-07 (2018) (ordering release of redacted employee complaints held by school district under state's public records law, but applying "common law balancing test" to determine extent of redactions); *Easton Area Sch. Dist. v. Miller*, 659 Pa. 606, 635-36 (2020) (same as *Clark Cnty.*, regarding records held by school district).

Having established that the common law right of access creates a duty to release reasonably segregable and disclosable information from public records containing a mix of non-disclosable information, plaintiff must also show this duty is ministerial, *i.e.*, that the segregation duty "admits of no discretion, so that the official in question has no authority to determine whether to perform the duty." *Swan*, 100 F.3d at 977. Here, defendant lacks discretion as to whether to release information sought by plaintiff that is not "security information," if the court so orders after application of the *WLF I* test. Thus, the duty to redact appears to be ministerial, and mandamus may lie to compel it.

Accordingly, should the Court find that public's interest in segregable non-security-information portions of these remaining 64 USCP policy directives outweigh the government's interest in secrecy, defendant must fulfill his ministerial duty to produce those portions. Taking plaintiff's allegations as true, no other adequate means are available to obtain this relief and he has stated a claim satisfying the first two jurisdictional prongs for mandamus, thereby successfully invoking the *Larson-Dugan* exception to the sovereign immunity bar on jurisdiction. His claims as to these 64 directives therefore survive defendant's motion to dismiss.

**IV.    CONCLUSION**

For the foregoing reasons, defendant's Motion to Dismiss, ECF No. 10, is GRANTED IN PART as to plaintiff's request for Directive 1000.002 (Retrieval of Archived Video), and is otherwise DENIED as to plaintiff's request for access to the other 100 USCP policy directives in effect on January 6, 2021.  An order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: March 10, 2026

_____
**BERYL A. HOWELL**
United States District Judge